FRUIT DISTRIBUTING CO., Inc. v.
BOAG et al.

No. 2427.

United States District Court
S. D. Alabama, S. D.

Oct. 12, 1950.

432

Palmer Pillans, Pillans, Reams, Tappan, Wood & Roberts, Hamiltons & Denniston, of Mobile, Ala., for libelant.

Gessner T. McCorvey, of McCorvey, Turner, Rogers, Johnstone & Adams, Mobile, Ala., for respondents.

McDUFFIE, District Judge.

## Findings of Fact.

### I

Prior to October 1947 and throughout the time pertinent to this litigation, the Mobile Fruit & Navigation Co., Inc., an Alabama corporation (which will for convenience be designated hereinafter "the Navigation Company"), was engaged in the importation by sea carriage of bananas from Central America to Mobile.

### II

Prior to October 1947, the Navigation Company procured itself to be insured, by Lloyd's Policy No. 669636, against loss of or damage to cargoes of bananas that it might carry from time to time in such business of importation; and the said policy of insurance was in full force and effect throughout the time pertinent to this litigation.

### III

The said policy of marine insurance contained what is styled the *"U. S. A. Dollar— Jurisdiction and Service of Suit Clause"*, the text of which is set out below:

"Notwithstanding that this policy has been effected in London, England, this policy shall be governed exclusively by United States of America Law and any disputes arising thereunder shall be exclusively subject to United States of America jurisdiction.

"It is agreed that in the event of the failure of underwriters hereon to pay any amount claimed to be due hereunder Underwriters hereon at the request of the Assured will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and service of process in such suit may be made upon Messrs. Mendes and Mount and that in any suit instituted against any one of them upon the Contract Underwriters will abide by the final decision of such Court or of any appellate Court in the event of an appeal. Messrs. Mendes and Mount of New York are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the Assured's request to give a written undertaking to the Assured that they will enter the general appearance upon Underwriters behalf in the event such a suit shall be instituted."

And the policy also contained a Particular Average and Loss Clause, the text of which is set out below:

"Warranted free from Particular Average and Loss unless caused by the vessel, craft or conveyances being stranded, sunk, burnt, on fire, or in collision or contact with any external substance (ice included) other than water, including breakdown of Refrigerator Machinery, but to pay all claims for all damage &/or deterioration to the Interest insured caused by breakdown &/or latent defect of Regrigerator Machinery &/or Plant &/or Insulation, but no claim shall be recoverable hereunder unless breakdown be for a period of not less than twenty-four hours.

"Subject to institute Cargo Clauses (ex. Nos. 9 & 10) including Wartime Extension Clause, as attached.

"Subject to jurisdiction and Service of Suit Clause, as attached. Including other clauses, so far as they apply, as attached. Including all risks of war, strikes, riots, civil commotions and malicious damage as per Institute Clauses attached."

## IV

The Navigation Company was transporting bananas at pertinent times in the Steamship Panama City. At 12:20 on the morning of October 9, 1947, The Panama City sailed from Puerto Barrios, Guatemala, for Mobile with a cargo of bananas belonging to the Navigation Company and covered by the said marine insurance policy. The voyage progressed without incident until 8:45 in the evening of October 10, when the Master received a weather report announcing the presence of a hurricane in a south-southwesterly direction from Havana, tending to increase in violence in about twelve hours, and expected to cross the end of the Island of Cuba west of Havana and toward the Florida Keys. At that time The Panama City was experiencing strong winds out of the northwest with heavy squalls. The next morning, the wind was increasing and the barometer was dropping slowly.

At 1:10 p. m., on October 11, the Master was advised that the hurricane had curved toward the northeast and there was no indication that there would be a heavy blow in the Gulf.

The voyage progressed without any other heavy weather than strong winds with a heavy and confused sea.

At 4:30 on the morning of October 14, when the ship was from 90 to 100 miles off the Mobile sea-buoy, there was trouble with the starboard boiler. The Chief Engineer investigated and found it dangerous to attempt to continue the boiler in use; so it was shut off. After the boiler had cooled enough to investigate further, it was discovered that a number of tubes were leaking and it was impossible to use the boiler until it could be repaired.

## V

The Panama City had two boilers, starboard and port, and two screws, one for each boiler. The steam produced by the boilers was used to propel the ship and to operate all the auxiliary services of the ship, including the refrigeration system, the bilge and circulating pumps, the lighting system, the stove and other cooking devices in the galley, the anchor windlass, and other lesser services.

## VI

When the starboard boiler was shut down, the Master and Chief Engineer attempted to proceed on the voyage with the steam from the port boiler devoted to propelling the ship and operating all the auxiliaries, including the refrigerator machinery and/or plant. This effort was made for a period variously estimated by witnesses as from one and a half to two hours. The ship was able to make only 1 1/2 to 2 knots, at which speed she had barely steerageway and no maneuverability.

## VII

When it became apparent that it was not practicable to navigate the ship into port under her own power, and keep in operation the necessary auxiliary services, including the lights and the refrigerator plant, the steam was shut off from the refrigerator plant and the additional steam thus obtained devoted to propelling the ship. When this was done, the ship made about 4 knots and had steerageway and maneuverability.

## VIII

The barometer had been fluctuating and was falling at the time the starboard boiler let down and was cut out. The sea was choppy and at times sufficiently heavy to wash over the ship's deck. It was the Master's considered opinion, after trying to drive the ship forward with the refrigerator system working, that a proper consideration for all interests concerned required him to shut off the steam from the refrigerator system and to devote that steam to attempting to reach port.

## IX

When the starboard boiler went out and it was ascertained that it was out definitely for the rest of the trip, the Master telephoned to Mobile, by way of ship-to-shore telephone facilities at New Orleans, that his ship was broken down in the Gulf about 100 miles in a southerly direction from Fort Morgan, and requested that a tug be sent for them. The tug was sent out, but did not find the vessel.

The Panama City came on under her own power all the rest of the 14th and into the morning of the 15th of October. At 6:00 a. m. on October 15, she took a pilot aboard at the Mobile sea-buoy, and the Master sent word into Mobile that he was at the bar and to send a tug for him. The ship kept on under her own power until she got into Mobile Bay, where she arrived at about 9:55 in the forenoon of October 15. At 9:55, the steam was turned on again into the refrigerator system and the ship's speed again fell to 1 1/2 knots per hour. ' At 10:55 a. m., the tug picked up the ship and brought her on into Mobile where she docked at 4:45 in the afternoon of October 15.

The discovery that the starboard boiler was in trouble and could not be used further, was made at 4:30 a. m., October 14. The effort to propel the ship with a portion of the steam devoted to refrigeration, was continued not more than two hours. The shutting of the steam off from the refrigerator system occurred not later than 6:30 in the morning of October 14. After the vessel got into Mobile Bay and the steam was turned again into the refrigerator system at 9:55 in the morning of October 15, the refrigeration was continued until the vessel berthed at 4:45 in the afternoon of October 15. The refrigeration was thus off for a period of more than twenty-four hours.

## X

The bananas that constituted the cargo of The Panama City were green and in proper condition for transporting to Mobile without material injury to the cargo, had the refrigeration thereof continued throughout the voyage. The said bananas actually arrived in Mobile from 90% to 95% ripe, by reason of which they were materially impaired in value.

## XI

The refrigeration was accomplished in the fashion now to be described:

There were cooling coils or units. Into these coils, under heavy pressure, came a spray of liquefied freon gas, through an admission valve. This spray, relieved of pressure, assumed a gaseous form and extracted the heat from the air surrounding the coils, thus chilling the air. Blowers or fans forced this chilled air through ducts that distributed the chilled air throughout the holds in which the bananas were stowed, the bananas being stowed in such fashion as to permit free circulation of the chilled air.

After the process just described had taken place, the gas passed through compressors where the process of liquefaction was accomplished by means of steam-driven pistons applying heavy pressure. The gas then passed into condenser chambers where the heat was removed.

Then this liquefied gas started over again the cycle through the release valve into coils, and so on around the circuit again.

The steam that operated the cylinders to compress the gas, that operated the blowers to circulate the chilled air, that operated the suction device that took the gas from the cooling coils into the condenser chambers, and that operated the pumps that pumped the water that cooled the heated gas while in the condenser chambers—all came from the two boilers, which furnished the only steam the ship had. This steam also furnished the power for the generating machinery that lighted the ship, and furnished the other auxiliary services hereinbefore referred to. It was not possible on The Panama City to operate the refrigerating system except by use of steam from the main boilers.

## XII

The bananas were discharged at Mobile as speedily as practicable, the quantum of loss was estimated, and demand for payment made promptly on underwriters by

the Navigation Company. The underwriters declined payment.

While discussion of the claim was being had between the Navigation Company and Underwriters, the Navigation Company assigned, for value, its claim against underwriters, to Fruit Distributing Co., Inc., an Alabama corporation, the libelant in this action. Such assignment was made prior to the institution of the instant litigation.

### XIII

Under and pursuant to the pertinent clause of the Policy set out in Article III of this Findings of Fact, the underwriters designated one Graham Cochran Boag as the person to appear and defend for all the underwriters, and agreed that underwriters would abide the decree of the Court rendered in this cause and in any appeal from the decree herein. The defendant, Graham Cochran Boag, appeared and answered on behalf of himself and all other underwriters subscribing the said Lloyd's Marine Insurance Policy.

### XIV

The amount of loss claimed of underwriters by the Navigation Company was $7,461.24. None of this sum has been paid, and liability therefor has been denied by the underwriters.

### XV

At the outset of the trial, it was agreed by counsel, with sanction of the Court, that the evidence would be directed to the determination of liability, *vel non,* and that no evidence would be adduced going to the measure of damage; that if there should be a decree for libelant, an order of reference might issue, unless counsel could agree upon the measure of damage. The evidence at the trial was confined to the question of liability, *vel non.*

### Conclusions of Law

As the bananas were not a total loss, the loss came under the Particular Average Loss Clause of the contract of marine insurance, and the right of recovery depended upon whether or not this Particular Average Loss was within the undertaking set out in the said Clause, which is copied into the foregoing Findings of Fact. The undertaking therein set out and here pertinent is, "to pay all claims for all damage &/or deterioration of the interest insured caused by breakdown &/or latent defect of Refrigerator Machinery &/or Plant &/or Insulation, but no claim shall be recoverable hereunder unless breakdown be for a period of not less than twenty-four hours."

There was "damage &/or deterioration to the interest insured"; and the conditions which caused that damage continued for a period of considerably more than twenty-four hours. The subject matter of debate, stated in the pleadings and argued at the trial, was whether or not the happening hereinbefore recited constituted a "breakdown * * * of refrigerator machinery &/or Plant". The libel charges that the matters recited in the libel and proved by the evidence as heretofore found in the Findings of Fact, constituted a breakdown of the refrigerator machinery and/or plant within the intendment of the policy, and that the loss was the proximate result of such breakdown. Issue was joined on this, and that constitutes the question that the Court must determine.

The court is of the opinion that the starboard boiler was an integral and indispensable part of the "Refrigerator Machinery &/or Plant", and thinks that this conclusion would be unavoidable, even if the word "Machinery" had been used alone, without the addition of the phrase "&/or Plant". The authorities cited at the argument by libelant (which are set out in Note 1 below) seem persuasive; and no authorities, either of text writers or adjudged cases, were cited contra by respondents.

*A fortiori,* does it seem clear that the starboard boiler was within the contemplation of the policy when we consider the

1. Tubbs v. Mechanics' Ins. Co., 131 Iowa 217, 108 N.W. 324, 326; Commonwealth v. Lowell Gas Light Co., 12 Allen, Mass., 75, 76, 78; Corning v. Burden, 15 How., U.S., 252, 267, 14 L.Ed. 683; Georgia Pac. R. R. Co. v. Brooks, 84 Ala. 138, 139–140, 4 So. 289.

addition to the word "Machinery" of the words "&/or Plant". A wide scope attaches to the use of that phraseology by the adjudged cases dealing with similar language, as appears from the authorities cited by libelant and set out in Note 2 below.

■ That the loss by undue ripening of the bananas was the proximate result of the breakdown of the boiler, seems equally clear. This court deems the chain of causation unbroken. Ships are refrigerated for the carriage, not the storage, of perishable cargo. It is plain that the steamer could not proceed on her voyage and maintain maneuverability at sea, with a falling barometer and uncertain weather, if she kept the steam on the refrigerator system. Reasonable effort was made to determine this, and the result of such effort showed its impossibility. The ship had only moderate maneuverability at four knots with the steam turned off from the refrigerator system.

In Milwaukee, & St. P. Ry. Co. v. Kellogg, 94 U.S. 469, 24 L.Ed. 256, the Supreme Court considered this proximate-cause doctrine in an opinion that has been quoted and followed many times and in many jurisdictions. The Court said, 94 U.S. at pages 474 and 476:

"The true rule is, that what is the proximate cause of an injury, is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. The primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end, that force being the proximate cause of the movement, or as in the oft-cited case of the squib thrown in the market place, 2 Bl.Rep. 892.

\*   \*   \*   \*   \*   \*

"In the nature of things, there is in every transaction a succession of events, more or less dependent upon those preceding, and it is the province of a jury to look at this succession of events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time."

The Kellogg case was an action at law, tried to a jury. The trial judge left to the jury to determine, on all the facts, whether the destruction of plaintiff's property by fire was the proximate result of defendant's negligence in setting fire to an elevator which was some distance from plaintiff's property but from which the fire was communicated to plaintiff's mill and lumber. The jury found a continuous sequence, not dissevered by any new and independent agency; and this was affirmed on appeal.

Should what actually happened have "been foreseen in the light of the attending circumstances", Milwaukee, & St. P. R. Co. v. Kellogg, 94 U.S. 469, 475, 24 L.Ed. 256, as the natural result of the letting down of the starboard boiler? If so, there was no break in the chain of causation.

■ The criterion suggested in the Kellogg case, is put thus by the Supreme Court of Alabama, speaking by Chief Justice McClellan, in Armstrong, Adm'x v. Montgomery St. Ry. Co., 123 Ala. 233, 26 So. 349: if a consequence be one that prudent and experienced men, fully acquainted with all the circumstances which in fact existed, would have thought reasonably possible to follow the cause, it is a proximate result. Apt illustrations are afforded by Brown v. Chicago, M. & St. P. Railway Co., 54 Wis. 342, 11 N.W. 356, 41 Am.Rep. 41, 42-43, 50-51 (citing and following the Kellogg case); Selma Street & Suburban Ry. Co. v. Owen, 132 Ala. 420, 31 So. 598.

As the Navigation Company suffered damage from a peril insured against, and consequently a right accrued to the Nav-

2. Alabama Employers Liability Statute, Acts of Ala. of 1884–85, p. 115; Sloss-Sheffield Steel & Iron Co. v. Mobley, 139 Ala. 425, 36 So. 181; Going v. Alabama Steel & Wire Co., 141 Ala. 537, 37 So. 784; Riddle v. Bessemer Soil Pipe Co., 170 Ala. 559, 54 So. 525; Tennessee Coal, Iron & R. Co. v. Wiggins, 198 Ala. 346, 73 So. 516; Huyck v. McNerney, 163 Ala. 244, 50 So. 926.

igation Company, which has been assigned to libelant; and, as the underwriter has declined to pay the claim or any portion thereof, libelant should have a decree for damages and costs, when the quantum of such damages shall have been determined. Unless counsel shall agree upon the quantum of damages within four weeks from the date hereof, an order of reference will be made to a Commissioner for the determination of the amount of damage and the report thereof to this Court for final decree.